IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LUIS ALLEN SIMS,                          *

     Plaintiff,                           *

v.                                        *          Civil Action No. GLR-19-704

MARYLAND DEPARTMENT OF                    *
PUBLIC SAFETY AND
CORRECTIONAL SERVICES, et al.,            *

     Defendants.                          *
                            ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Motion to Dismiss filed by Maryland

Department of Public Safety and Correctional Services ("DPSCS") (ECF No. 27); the

Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement filed by

Wexford Health Sources, Inc., Liberatus De Rosa, M.D., Kasahun Temesgen, M.D., Ayoku

Oketunji, M.D., Zowie Barnes, M.D., Motunrayo O. Adegorusi, N.P., Emmanuel Esianor,

P.A., and Nicole Hargrave[1] (collectively, "Wexford Defendants") (ECF Nos. 33, 35); and

the Motion to Dismiss or Alternatively for Summary Judgment filed by Corizon Health,

Inc., Dr. Liberatus De Rosa, Dr. Zowie Barnes, Dr. Kasahun Temesgen, Montunrayo

Adegorusi, NP, Emmanuel Esianor, PA, and Nicole Hargrave (collectively, "Corizon

Defendants") (ECF No. 37).[2] The Motions are ripe for disposition, and no hearing is

---

[1] The Court will direct the Clerk to amend the docket to reflect the correct names of
Defendants.

[2] Also pending before the Court are Plaintiff Luis Allen Sims' Motion to Appoint
Counsel (ECF No. 54) and Motion to Compel (ECF No. 55).

necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motions.

## I.    BACKGROUND

### A.    <u>Sims' Oppositions</u>

To clarify the source material of the factual background set forth below, the Court first addresses the validity of a series of filings submitted by Sims after Defendants filed their Motions to Dismiss. First, in a submission labeled on CM/ECF[3] as a Response to Wexford Defendants' Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement, Sims provides a series of affidavits and exhibits without a clear structure. (Pl.'s Resp. Wexford Defs.' Mot. Dismiss ["Pl.'s 2d Opp'n"], ECF No. 38). Among the exhibits is an affidavit of fellow inmate Michael Brochu, who alleges that like Sims, he suffers from "thyroid cancer," and Wexford has downplayed his cancer, resulting in delayed treatment

---

A <u>pro se</u> prisoner does not have a general right to counsel in a § 1983 action. <u>Evans v. Kuplinski</u>, 713 F.App'x 167, 170 (4th Cir. 2017). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is discretionary, and an indigent claimant must present "exceptional circumstances." <u>Id.</u> at 170; <u>Miller v. Simmons</u>, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." <u>See</u> <u>Whisenant v. Yuam</u>, 739 F.2d 160, 163 (4th Cir. 1984), <u>abrogated on other grounds by</u> <u>Mallard v. U.S. Dist. Ct</u>., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Upon careful consideration of the Motions and previous filings by Sims, the Court finds that Sims has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending before the Court are not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent Sims under 28 U.S.C. § 1915(e)(1). Accordingly, Sims' Motion to Appoint Counsel will be denied.

As for Sims' Motion to Compel, this Motion will be denied for the reasons stated in the Court's April 10, 2020 Order denying Sims' previous Motion to Compel. (<u>See</u> ECF No. 53).

[3] CM/ECF is the Court's Case Management/Electronic Case Files system.

and the spread of his cancer. (Pl.'s 2d Opp'n Ex. 2 ["Brochu Decl."], ECF No. 38-2). Sims also provides the affidavit of inmate Timothy Bunke, who alleges that he has received "inadequate care" regarding knee pain from Wexford and Corizon while housed at Jessup Correctional Institution ("JCI"). (Pl.'s 2d Opp'n Ex. 3 ["Bunke Decl."], ECF No. 38-3).

Sims also provides his own declaration, which consists of bullet points of dates and interactions with medical and correctional staff from January 24, 2018 to October 17, 2019. (Pl.'s 2d Opp'n Ex. 1 ["Sims Decl."], ECF No. 38-1). Sims outlines dates in January 2019 when his medical appointments were cancelled. (Id. at 1–2). He states, inter alia, that Defendant Dr. Kasahun Temesgen ordered an ultrasound in June 2019 that has not been done; that he has not been seen by a cardiologist; that he has not received his orthotic shoes; and that he has not been referred to a gastroenterologist. These allegations go well beyond the allegations in the Complaint and are incomplete, as they do not fully explain who requested the consultation or testing; why it was not provided; and/or what harm Sims has suffered as a result. Sims also provides excerpts of his medical records from 2015 to 2019, as well as copies of letters and grievances written regarding his medical care. (Pl.'s 2d Opp'n Exs. 4–5, ECF Nos. 38-4, 38-5).

On December 5, 2019, Sims filed an Opposition to Corizon Defendants' Motion to Dismiss or Alternatively Motion for Summary Judgment, which was again accompanied by a series of exhibits as well as novel allegations. (Pl.'s Resp. Corizon Defs.' Mot. Dismiss ["Pl.'s 3d Opp'n"], ECF No. 41). In it, Sims alleges, for the first time, that the following conditions have not been properly treated by unidentified medical personnel: congenital heart disease, pancreatic cancer, uncontrolled hypertension, gastroenterology, seizure

disorder, kidney issues, degenerative disc disease, and severe headaches. (Id.; Pl.'s 3d Opp'n Ex. 1, ECF No. 41-1). Sims also claims Defendant Nicole Hargrave violated his rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and that Corizon Defendants conspired to protect Temesgen. (Pl.'s 3d Opp'n at 17).

Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. See Zachair Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998); Mylan Laboratories, Inc. v. Akzo, N. V.,770 F.Supp. 1053, 1068 (D.Md. 1991), aff'd, 2 F.3d 56 (4th Cir. 1993). The Court therefore will not consider the allegations raised for the first time in Sims' Oppositions.

Additionally, on December 30, 2019, Sims submitted to the Court two letters addressed to Defendant Hargrave, which were docketed on CM/ECF as a Supplemental Complaint. (Pl.'s Suppl. Submission ["Ltrs. to Hargrave"], ECF No. 44). The letters in fact appear to constitute a supplemental Opposition and are construed as such. In the filing, Sims confirms that in December 2019, he was seen for follow-up by two outside specialists and additional diagnostic testing had been requested. (Id. at 2).

Finally, Sims has filed several surreplies to Defendants' Motions. (ECF Nos. 49, 57, 60, 61).[4] No party is entitled to file a surreply unless authorized by the Court. See Local

---

[4] Sims filed additional supplements to his Complaint on August 17, 2020 and September 4, 2020. (ECF Nos. 60, 61). These Supplements contain documents and allegations regarding medical care provided in 2020, well after Sims filed his initial Complaint. As such, the Court declines to consider the Supplements.

4

Rule 105.2(a) (D.Md. 2018). A surreply is most often permitted when the moving party must respond to matters raised for the first time in a reply. <u>See</u> <u>Lewis v. Rumsfeld</u>, 154 F.Supp.2d 56, 61 (D.D.C. 2001). Sims neither sought authorization for these surreplies nor appears to be responding to novel arguments contained in Defendants' Replies in support of their Motions. Accordingly, Sims' surreplies are unauthorized and will not be considered.

**B.**   <u>**Sims' Allegations**</u>

Sims is a state prison inmate presently housed at Jessup Correctional Institution ("JCI") in Jessup, Maryland. (Compl., ECF No. 1). In his unverified Complaint, dated February 25, 2019, Sims alleges that his health began to decline in 2015 when he was diagnosed with cancer.[5] (<u>Id.</u> at 4–6). Sims alleges that medical appointments with specialists were missed due to the incompetence of administrative staff. (<u>Id.</u> at 6).

Sims alleges DPSCS is liable for its "negligence and incompetence" in failing to conduct a thorough investigation into Wexford's and Corizon's "background[s]." (<u>Id.</u> at 12). Sims also claims that unspecified employees of DPSCS failed to take appropriate action in response to his complaints. (<u>Id.</u> at 24).

Sims states that Corizon is liable for his pain and suffering due to not following all specialists' recommendations; its incompetent medical staff; and its inadequate rules, policies, and regulations. (<u>Id.</u> at 12–13). He claims that employees of Corizon changed his medication without authorization from his specialty care providers. (<u>Id.</u> at 20–22). Sims

---

[5] There is no mention of Sims' cancer diagnosis in the medical records provided to the Court.

also alleges that Corizon staff knowingly inflicted pain and suffering by not following the treatment recommendations of specialists. (Id. at 12–13). Additionally, Sims alleges that he was "almost" given aspirin, to which he is allergic. (Id. at 20–22).

Sims further claims that Wexford and its employees have knowingly changed medication orders from outside specialists in order to save money, and that Wexford and unidentified medical staff have cancelled numerous medical appointments and falsified medical documents. (Id. at 13, 22).

Sims also makes a series of allegations against the individual Defendants named in the Complaint. According to Sims, Defendant Liberatus De Rosa, M.D. "played a major role helping to cover-up the negligence and incompetence of the medical staff at JCI." (Id. at 13). As for Defendant Kasahun Temesgen, M.D., Sims alleges he had "the power to intervene and correct any deficiencies [in Sims' care]," and stopped or changed medication ordered by outside specialists. (Id.). Sims states that Defendant Ayoku Oketunji, M.D. also had the authority to stop and correct deficiencies in Sims' medical care, but despite knowing Sims was provided the wrong medication, showed no concern. (Id.). Sims alleges that Defendant Zowie Barnes, M.D. is motivated by "cost," did not follow through with Dr. Abdi's order regarding Sims' treatment, and committed perjury in 2015.[6] (Id. at 14–

---

[6] Sims does not provide Dr. Abdi's first name or explain what medical treatment he or she ordered. Additionally, any allegations relating to conduct in 2015 fall outside of the three-year statute of limitations. See Wallace v. Kato, 549 U.S. 384, 387 (2007) ("Section 1983 provides a federal cause of action, but in several respects relevant here, federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: it is that which the State provides for personal-injury torts."); see also Md. Code Ann., Cts. & Jud. Proc. § 5-101 (providing the statute of limitations for

15, 21). Similarly, Sims alleges that Defendant Motunrayo O. Adegorusi, N.P. did not provide adequate medical care because he is driven by cost, and further had knowledge of "wrongdoings and deficiencies of negligence denying prisoners proper medical care" but took no action. (Id.). The Complaint also states that Physician's Assistant "Emanual" knew of unspecified "wrongdoing" and failed to prevent Sims' pain and suffering. (Id. at 16). Finally, Sims asserts that Defendant Nicole Hargrave had the power to prevent Sims' suffering and negligently failed to do so. (Id. at 17).

In sum, Sims alleges that Corizon, Wexford, and "their personnel" were deliberately indifferent to his medical needs and that their conduct constitutes medical malpractice or negligence. (Id. at 25).

## C.   Medical History

Sims has a medical history of hyperthyroidism secondary to Graves' Disease, hypertension ("HTN"), type-2 diabetes, and Hepatitis C virus ("HCV"). (Corizon Defs.' Mot. Dismiss Alt. Summ. J. ["Corizon Mot."] Ex. A-1 ["Med. Recs."] at 2, ECF No. 37-4). Graves' Disease is an autoimmune disorder that causes an overactive thyroid (i.e., hyperthyroidism). (Corizon Mot. Ex. A ["De Rosa Decl."] ¶ 5, ECF No. 37-3). In those with Graves' disease, the body's immune system attacks the thyroid, which causes it to make more thyroid hormone than is needed. (Id.). Thyroid-stimulating hormone ("TSH") stimulates the thyroid gland. (Id.). Sufferers of Graves' Disease typically have below normal levels of TSH and above normal levels of thyroid hormones. (Id.). "Thyroid

---

personal injury claims is three years from the date of the occurrence). Accordingly, Sims' claims against Barnes will be dismissed.

hormones control the body's use of energy, and they affect nearly all organs in the body." (Id.).

Symptoms associated with Graves' Disease include "anxiety and irritability, increased heat sensitivity and perspiration with warm, moist skin, a slight tremor in the hands or fingers, weight loss, frequent bowel movements, fatigue, and rapid or irregular heartbeat." (Id.). Treatment is directed toward lessening the production of thyroid hormones and decreasing the severity of symptoms. (Id.). Treatments for Graves' Disease include radioactive iodine therapy or ablation; anti-thyroid medications such as Methimazole ("MMI"); beta blockers such as Propranolol, Atenolol, or Metoprolol; and/or surgery to remove all or part of the thyroid. (Id.). Sims was diagnosed with Graves' Disease in 2015 or 2016. (Med. Recs. at 2). He was prescribed MMI with a gradually decreasing dose. (Id.). Sims was considered for radioactive iodine ablation, but he was not interested in the procedure,[7] instead hoping that medication management would cause the disease to go into remission. (Id.).

Dr. Medha Satyarengga, an endocrinologist at University of Maryland Medical Center ("UMMC"), evaluated Sims on September 27, 2018. (De Rosa Decl. ¶ 4; Med. Recs. at 2–6). Sims reported that he continued to have heat intolerance and frequent bowel movements since his prior appointment with Dr. Satyarengga. (Med. Recs. at 2). Sims'

---

[7] Sims disputes that he declined radioactive iodine ablation. (Pl.'s 3d Opp'n at 13). For the reasons discussed below, even if Sims were interested in ablation, this does not create a genuine issue of material fact regarding whether Corizon Defendants were deliberately indifferent to his serious medical needs.

weight was stable and there were no tremors during this visit. (Id.). He reported pain in the mid-abdomen and expressed concern regarding his pancreas. (Id.). He was prescribed MMI twenty milligrams daily. (Id.). An examination revealed that Sims' thyroid was enlarged. (Id. at 4). Dr. Satyarengga assessed Sims as clinically euthyroid (i.e., having a normal thyroid) with some hyperthyroid complaints that were not supported by the physical examination. (Id. at 6). Dr. Satyarengga planned to check additional laboratory results to determine whether Sims' Graves' Disease was going into remission and noted that given current symptoms and management, radioactive ablation was no longer necessary. (Id.). Dr. Satyarengga recommended continuing MMI twenty milligrams daily, pending the blood work. (Id.). Dr. Satyarengga also planned liver function tests ("LFTs") to ensure Sims did not suffer any liver injury from MMI. (Id.). If the LFTs were normal, he recommended Sims consider a gastroenterology ("GI") consult regarding his abdominal pain. (Id. at 6).

Sims was diagnosed with diabetes in 2007. (Id. at 2). Dr. Satyarengga noted that at the time of his examination in September 2018, Sims was prescribed Levemir twenty units; five units of regular insulin, as needed, for blood sugar over 150; Metformin two grams; and Empagliflozin twenty-five milligrams to manage his diabetes. (Id.). Sims' A1C, a blood test used to measure the average blood glucose level over the past three months, was 7.9 percent. (Id. at 2; De Rosa Decl. ¶ 7). The goal for most adult diabetics is to have an A1C less than seven percent. (De Rosa Decl. ¶ 7). Sims advised that he checked his blood sugar daily and had readings ranging from 80 to 120. (Med. Recs. at 2). He denied

hypoglycemia or severe hyperglycemia.[8] (Id.). Dr. Satyarengga noted that Sims' A1C reading had improved relative to his previous blood work. (Id. at 6). Dr. Satyarengga also noted that Sims' daily glucose readings were within the therapeutic goal. (Id.). Dr. Satyarengga recommended Sims continue taking his medications as prescribed, have a yearly retinal exam, and continue routine foot care. (Id.).

On the date of his examination by Dr. Satyarengga, Sims was not taking Atorvastatin and his blood pressure was uncontrolled. (Id.). At that time, he was taking Amlodipine ten milligrams; Lisinopril fifty milligrams; Metoprolol fifty milligrams twice daily; and Clonidine .1 mg twice daily. (Id. at 3). Dr. Satyarengga recommended beginning Atorvastatin twenty milligrams daily, and that a consultation with a cardiologist or nephrologist be considered. (Id. at 6). Sims also reported that he was allergic to aspirin, which causes him to break out in hives. (Id. at 2).[9]

On January 8, 2019, Sims' laboratory report showed his A1C had improved to 6.7 but his TSH was elevated at 9.140. (Med. Recs. at 7–8). The normal range for TSH is 0.178 to 4.530. (De Rosa Decl. ¶ 11). Sims had additional laboratory work on January 22, 2019; at that time, his TSH was 3.570, within the normal range. (Med. Recs. at 7–8).

Dr. Liberatus De Rosa evaluated Sims in the chronic care clinic on January 24, 2019, regarding Sims' Graves' Disease, hypertension, and diabetes. (Id. at 10). Sims' A1C had

---

[8] Sims disputes that he denied he was hypoglycemic or hyperglycemic. (Pl.'s 3d Opp'n at 13). Whether or not Sims reported he was hypoglycemic or hyperglycemic in September 2018, prior to Corizon Defendants becoming responsible for his care, does not create a dispute of material fact.

[9] Since that time, Sims' records have reflected his aspirin allergy and he has not been provided aspirin. (De Rosa Decl. ¶ 35).

improved from 8.8 to 6.7, and he appeared to have his blood sugar controlled. (Id.). However, his blood pressure was not well-controlled. (Id.). De Rosa planned to consider a renal consult. (Id.). As to Graves' Disease, De Rosa noted that Sims' thyroid seemed to be converting to a "burned-out state and hypothyroidism may be imminent." (Id. at 10). Sims' recent laboratory results showed no renal dysfunction. (Id.).

De Rosa also reviewed and continued Sims' medications, which included multiple medications to treat his high blood pressure. (Id. at 11; De Rosa Decl. ¶ 12). De Rosa noted that Sims' Graves' Disease was better controlled at a lower dose of MMI, but planned to wait four more weeks for a baseline level before adjusting the dosage. (De Rosa Decl. ¶ 12). De Rosa avers that he did not see any records from UMMC after the September 27, 2018 consultation that recommended reducing MMI to five milligrams per day. (Id. ¶ 16). Nevertheless, Sims' TSH levels, reported from his February 2019 laboratory work, showed his TSH level was moving toward the normal range. (Id. ¶ 17). Sims' A1C had increased slightly from 6.7 to 6.8, his TSH was high at 5.2, but his thyroxine ("T4")[10] was normal at 1.04. (Med. Recs. at 13–14).

Defendant Emmanuel Esianor, P.A. evaluated Sims on March 12, 2019 at sick call to address Sims' inquiry about following up with Hanger Orthotics for fitting of orthotic shoes. (Id. at 17). Esianor reported that Sims had bilateral foot pain and tenderness and mild pain with motion in both knees. (Id.). Esianor requested orthotic shoes for Sims from Hanger Orthotics. (Id. at 18).

---

[10] T4 is the main form of thyroid hormone circulating in the blood. See https://www.thyroid.org/thyroid-function-tests/ (last visited Sept. 15, 2020).

Raafia Memon, M.D., an endocrinologist at UMMC, evaluated Sims on April 11, 2019. (Id. at 21–23). Dr. Memon noted that since Sims' last visit, UMMC had recommended his prescription for MMI be decreased to five milligrams due to his TSH being elevated, but Sims continued to receive ten milligrams daily. (Id. at 21). Dr. Memon again recommended that Sims' MMI prescription be reduced to five milligrams daily. (Id.). Sims reported heat intolerance, diarrhea, heart palpitations, fecal incontinence, and occasional tremors. (Id.). Dr. Memon noted that Sims' symptoms suggested hyperthyroidism and that past laboratory results had suggested slight hypothyroidism. (Id. at 23). Dr. Memon planned to recheck the laboratory results and noted Sims may need his medication adjusted. (Id.). Given that Sims' MMI was to be titrated down with normalization of LFTs, Dr. Memon noted that radioactive iodine ablation was deferred. (Id.). Additionally, Dr. Memon recommended that Sims' MMI be continued at ten milligrams until the new laboratory work was completed. (Id.). Dr. Memon also recommended an evaluation by a cardiologist in light of Sims' reported palpitations, which he noted could be unrelated to Sims' thyroid disorder and caused instead by his uncontrolled hypertension. (Id.).

As to Sims' diabetes, Dr. Memon noted that Sims was then taking Levemir ten units; regular insulin, five units, as needed for blood sugar over 150; Metformin two grams; and Empagliflozin twenty-five milligrams. (Id. at 21). Sims stated that he was tolerating Empagliflozin well and denied having any urinary symptoms. (Id.). Sims' recent A1C was 6.8 percent. (Id.). Dr. Memon planned to recheck Sims' A1C, but noted that his blood glucose levels were tightly controlled. (Id. at 23). Dr. Memon recommended stopping

Levemir and restarting Glipizide if Sims developed hyperglycemia. (Id.). Dr. Memon also noted that it was unclear whether Sims had started Atorvastatin twenty milligrams, and if not, the medication should be started. (Id.).

Sims' blood pressure remained uncontrolled. (Id. at 23). Dr. Memon was not sure whether Sims was receiving Clonidine as prescribed and asked that the facility send Sims' medication list with him at each visit. (Id.). Dr. Memon also recommended that Sims be considered for a gastroenterology evaluation because Sims' diarrhea and fecal incontinence did not seem related to his hyperthyroidism. (Id. at 24).

Esianor evaluated Sims on April 17, 2019, following Sims' sick call slip requesting refills of Biotene and Lubri-skin lotion. (Id. at 26). Sims received Biotene. (Id.). Sims had also submitted a sick call slip asking for the results of his appointment with Dr. Memon, but refused to be seen that day because the appointment would conflict with count time. (Id.). Sims requested instead to be seen during his upcoming scheduled chronic care visit. (Id.).

De Rosa evaluated Sims on April 24, 2019 in the chronic care clinic. (Id. at 28–31). Sims' hypertension remained poorly controlled, which De Rosa noted could be related to emotional issues. (Id. at 28). Sims stated that consultations requested in October 2018 for gastroenterology and cardiology had not been completed. (Id.). De Rosa noted that Sims had a high level of anxiety and acted as though he had hyperthyroidism when in fact Sims' had only slight hypothyroidism. (Id.). At the time, Sims' A1C was under control. (Id.).

During the visit, Sims reported increased abdominal pain, diarrhea, and fecal incontinence. (Id.). De Rosa performed an examination, which discovered only slight

tenderness noted right of the umbilicus. (Id.). De Rosa planned to start with an abdominal series for abnormal gas pattern. (Id.). De Rosa noted that Sims had completed Epclusa in 2018 and believed his HCV was cured. (Id.). As to Sims' hypertension, De Rosa completed a hypertension management plan for Sims. (Id. at 29–30). At the time, Sims was taking both Lisinopril, an angiotensin-converting enzyme ("ACE") inhibitor, and Metoprolol, a Beta blocker. (Id. at 30).

De Rosa renewed Sims' prescriptions and ordered a consultation request for cardiology due to Sims' reported chest pain, palpitations, and history of congenital heart disease. (Id. at 32–33). De Rosa noted that Sims suffered from Graves' Disease that was under control. (Id. at 32). De Rosa also noted that Sims had frequent irregular heartbeats that suggested premature ventricular contraction ("PVC") and that Sims had a history of congenital heart disease that had been followed at Union Memorial Hospital for many years. (Id.). The records from Union Memorial were not available and De Rosa stated that an echocardiogram would help in diagnosis, since Sims' EKG and chest x-ray were within normal limits. (Id.). De Rosa also submitted a request to Podiatry for custom shoes for diabetes and malformation. (Id. at 34–35). Electa Awanga, N.P. later saw Sims regarding the custom shoe consultation and advised him that the scheduler reported that Sims had been approved for custom shoes. (Id. at 36).

Dr. Memon evaluated Sims again on May 2, 2019. (Id. at 38–41). Dr. Memon reviewed Sims' laboratory results from April 11, 2019 and tried to call JCI to speak with Sims' provider but was unsuccessful. (Id. at 39). Dr. Memon noted that Sims had recently been seen in the JCI chronic care clinic, Sims had been taking MMI ten milligrams daily,

14

and that his TSH was 5.2 in February 2019. (Id.). Sims reported symptoms of hyperthyroidism, but his TSH was down to 3.97 and TT3 was elevated. (Id.). Dr. Memon recommended continuing Methimazole at ten milligrams daily and rechecking Sims' laboratory results around May 10, 2019. (Id.).

On May 18, 2019, Adegorusi evaluated Sims due to his complaints of left posterior forearm swelling. (Id. at 44). Adegorusi noted that Sims had been seen two weeks prior with complaints of pain and acute swelling of the forearm. (Id.). Adegorusi reported that during the May 18, 2019 visit, Sims moved his hand without difficulty and no redness was noted. (Id.). Adegorusi diagnosed Sims as suffering from an elbow bursitis infection. (Id.). Adegorusi prescribed Doxycycline for ten days and acetaminophen as needed. (Id.). The following week, Sims refused his annual physical. (Id. at 45).

On May 31, 2019, Adegorusi saw Sims for follow-up regarding the elbow infection. (Id. at 47). The Doxycycline had been ineffective, and Adegorusi called Temesgen to follow up with Sims. (Id.). Sims also complained of abdominal pain and vomiting blood. (Id.). Adegorusi prescribed Zantac 150 milligrams twice daily for one month and requested a gastroenterology consult for Sims to have an abdominal ultrasound. (Id.). Adegorusi also ordered an x-ray of the abdomen, noting that Sims reported he had a surgical procedure twenty-nine years ago and staples were left in place. (Id. at 47–48). Because Sims' blood pressure was elevated, Adegorusi increased Sims' prescription for Lisinopril to eighty milligrams daily and ordered blood pressure checks twice daily for one week. (Id. at 47).

Sims' abdominal x-ray, taken on June 3, 2019, showed no abnormal gas pattern or air fluid levels; no evidence of bowel dilation, free air, or obstruction; no significant osseous abnormalities or radiopaque foreign bodies; and no acute disease. (Id. at 50).

Dr. Mofikpara Wright evaluated Sims in the chronic care clinic on July 19, 2019. (Id. at 53). At that time, Sims had no polyuria, polyphagia, abdominal pain, nausea, vomiting, fever, or chills. (Id.). His blood sugar was well controlled on Levemir and Metformin. (Id.). Dr. Wright also noted that Sims had a history of Graves' Disease with recent fatigue, weight loss, and frequent stools, which were managed by MMI, and that he had been last seen by an endocrinologist on April 11, 2019. (Id.). Dr. Wright reviewed Sims' recent laboratory results with him, including a thyroid function test, and renewed and ordered Sims' medications, including Clonidine, Lubri-skin lotion, multivitamin, Metformin, MMI at five milligrams twice daily, Lisinopril, Amlodipine, Biotene, Jardiance, Metoprolol, Ensure, and Levemir. (Id. at 54). Dr. Wright also submitted a consultation request for Sims to meet with the endocrinologist at UMMC. (Id. at 56).

On July 24, 2019, Sims was evaluated at Hanger Clinic for custom orthotic shoes and inserts. (Id. at 58–60). Later, a consult request for Hanger Orthotic was submitted for Sims to pick up his orthotic shoes. (Id. at 73).

On August 9, 2019, Adegorusi submitted a consultation request for Sims to have a follow-up with gastroenterology at UMMC. (Id. at 61).

Clarice Aryiku, C.R.N.P. saw Sims on August 30, 2019, for a provider visit and follow-up. (Id. at 68–70). Aryiku noted Sims had a history of hypothyroidism secondary to Graves' Disease and post-treatment HCV. (Id. at 68). Aryiku also noted that Sims had

16

been seen at the University of Maryland Center for Diabetes and Endocrinology ("UMCDE") on April 11, 2019, and UMCDE had requested a three-month follow-up. (Id.). Aryiku further noted that both a gastroenterology and cardiology consultation had been recommended. (Id.). Aryiku submitted a consultation request to UMCDE for the follow-up. (Id. at 71).

On examination by Aryiku, Sims was negative for abdominal mass, abdominal pain, altered bowel habits, black stool, bloating, blood in stool, constipation, decreased appetite, difficulty swallowing, flatulence, hematemesis, indigestion/heartburn, jaundice, nausea, painful swallowing, perirectal conditions, rectal bleeding, reflux, vomiting, and weight loss. (Id.). Sims was positive for diarrhea and bowel incontinence. (Id.).

## II.   DISCUSSION

### A.   DPSCS's Motion to Dismiss

DPSCS moves to dismiss the Complaint on the basis that it is immune from suit under the Eleventh Amendment to the United States Constitution.

Under the Eleventh Amendment to the United States Constitution, a state and its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Id. (citing Fla. Dep't of Health v. Fla. Nursing Home Ass'n, 450 U.S. 147 (1981) (per curiam)). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, see Md. Code

Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued." Halderman, 465 U.S. at 100. Thus, Sims' complaint against DPSCS, a state agency, is barred by the Eleventh Amendment and must be dismissed. Accordingly, DPSCS's Motion to Dismiss will be granted.

## B.   **Wexford Defendants' Motion**[11]

Wexford Defendants move to dismiss Sims' Complaint for failure to state a claim. In reviewing a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. See Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005); Ibarra v. United States, 120 F.3d 472, 473 (4th Cir. 1997); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Migdal v. Rowe Price-Fleming Int'l Inc., 248 F.3d 321, 325–26 (4th Cir. 2001);

---

[11] Wexford Defendants' dispositive Motion is captioned as a Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement. (See ECF No. 33). Under Rule 12(e) of the Federal Rules of Civil Procedure, "a party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Any such motion "must be made before filing a responsive pleading." Fed.R.Civ.P. 12(e). Here, Wexford Defendants filed their Motion for a More Definite Statement together with their Motion to Dismiss. As such, Wexford Defendants' request for a more definite statement will be denied.

see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States has explained that a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. Id. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. Thus, a complaint need only state "enough facts to state a claim to relief that is plausible on its face." Id. at 566.

Wexford Defendants argue that Sims' claims lack any degree of specificity and therefore must be dismissed for failure to state a claim. The Court agrees. Sims' Complaint consists of general allegations that unspecified defendants failed to properly treat his health conditions, improperly changed medications prescribed by specialist physicians in order to save money, falsified medical reports, failed to schedule or improperly scheduled or canceled medical appointments, falsified records contending Sims refused to attend appointments, and prescribed medication to which he was allergic. However, within his thirty-five-page Complaint, which is supported by forty-eight pages of exhibits, Sims does not specify which of the ten named Defendants were responsible for the allegedly improper acts, the dates on which they engaged in this conduct, or how he was harmed by these acts.

Additionally, even where Sims does name individual Defendants, he fails to provide enough information to state a claim. For example, as to his claim that Temesgen failed to correct his subordinates' deficient medical care, Sims has failed to allege how Temesgen knew of the deficiencies, what duty Temesgen had to fix them, and how Sims was harmed by Temesgen's failure to act. Similarly, Sims fails to identify which incompetent acts he claims De Rosa "covered up," when this was done, and how Sims was harmed. Nor does he explain how he was harmed by Oketunji's lack of concern and inaction when Sims was provided medication to which he was allergic. Sims claims that Esianor did nothing to prevent his pain and suffering, but provides no factual support regarding what Esianor failed to do, what Esianor knew, what he should have done, or how Sims was harmed through Esianor's actions. Further, Sims alleges that Hargrave neglected to schedule appointments and failed to respond to requests for help from inmates, but provides insufficient information as to what the requests for help were, which appointments were not scheduled, and how Sims was harmed by Hargrave's inaction. In all, Sims' Complaint cannot survive these fatal deficiencies, and Wexford Defendants' Motion will be granted.

## C.    <u>Corizon Defendants' Motion</u>

### 1.    **Conversion**

Corizon Defendants' Motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). See <u>Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and

not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.

2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Here, the Court concludes that both requirements for conversion are satisfied. Sims was on notice that the Court might resolve Corizon Defendants' Motion under Rule 56 because Corizon Defendants styled their Motion as a "Motion to Dismiss or Alternatively for Summary Judgment" and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Sims about the Motion and the need to file an opposition. (ECF No. 39). Sims filed Oppositions, as well as numerous documents and correspondence in support of his claims. Although Sims asked the Court to allow him "proper time to litigate Discovery Procedures to locate additional defendants who had the power to prevent . . . and chose to ignore the Plaintiff's

serious medical needs," (Pl.'s 3d Opp'n at 18), Sims does not explain what those discovery procedures would be, what additional information is required in order to counter Corizon Defendants' motion, or how the information would be necessary to do so. Additionally, the Court explained the requirements of Rule 56(d) to Sims in denying his previous requests for discovery. (ECF No. 53). Sims' general request for more discovery is not sufficient to prevent the Court from ruling on a summary judgment motion. Thus, because the Court will consider documents outside of Sims' Complaint in resolving Corizon Defendants' Motion, the Court will treat it as one for summary judgment.

### 2.   Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed.R.Civ.P. 56(c)(4).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3.      Analysis

Corizon Defendants argue that they were not deliberately indifferent to Sims' medical needs; Sims does not adequately demonstrate supervisory liability; and, to the

extent Sims asserts negligence and medical malpractice claims, these claims must fail. The Court addresses these arguments in turn.

### a.    Eighth Amendment Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King, 825 F.3d at 218; Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775

F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly. See, e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (finding that high blood pressure is a serious medical need); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical need); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).

The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendants knew about the problem. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225 ("Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result."); Russell v. Sheffer, 528 F.2d 318, 318 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim . . . .")

The reasonableness of a defendant's actions must be judged through the lens of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

The evidence in Sims' medical record makes clear that Corizon Defendants were not deliberately indifferent to Sims' medical conditions in violation of the Eighth Amendment. Sims' medical providers repeatedly addressed his complaints of pain by prescribing him medicine, ordering diagnostic tests, and referring him to outside providers.

Further, De Rosa avers that, within a reasonable degree of medical certainty, Sims has received care that meets or exceeds the standard of care for his Graves' Disease, type-2 diabetes, hypertension, and Hepatitis C. (De Rosa Decl. ¶ 34). Overall, the Court agrees.

As to Defendant De Rosa individually, the record shows that De Rosa provided constitutionally adequate medical treatment. De Rosa saw Sims in the chronic care clinic for his Graves' Disease and prescribed MMI in the dosage he believed appropriate to treat Sims' condition. During Sims' evaluation at UMMC by Dr. Satyarengga on September 27, 2018, Dr. Satyarengga agreed with continuing the dosage as prescribed by De Rosa pending laboratory results. In January 2019, De Rosa reduced Sims' MMI dose because Sims' Graves' Disease was under better control at that dosage level. When Sims returned to UMMC in April 2019, Dr. Memon noted that he had recommended the dosage be decreased even further. But after reviewing Sims' laboratory results, Dr. Memon recommended maintaining the dose De Rosa prescribed because it was effectively managing Sims' condition. When De Rosa saw Sims later that month, he continued the MMI at the dosage previously prescribed.

De Rosa's failure to lower the dosage to that recommended by the UMMC endocrinologist does not demonstrate deliberate indifference to Sims' medical needs. First, De Rosa avers that he was unaware of the recommendation.[12] (De Rosa Decl. ¶¶ 16–17).

---

[12] In one of his Oppositions, Sims takes issue with De Rosa's declaration, averring that De Rosa has treated him since 2017 but De Rosa's declaration only addresses treatment beginning on September 27, 2018. (Pl.'s 3d Opp'n at 12). This argument misunderstands the purpose of De Rosa's affidavit, which is offered only regarding his treatment of Sims from January 1, 2019—the date that Corizon became the medical provider at JCI—through

Secondly, in his independent medical assessment, he changed the dose to one he thought would work best for Sims pending additional testing—a dose that the specialist ultimately agreed was effective and recommended maintaining. Moreover, prison physicians are not required to follow the recommendations of outside specialists. See Starling v. United States, 664 F.Supp.2d 558, 570 (D.S.C. 2009) ("[T]hese recommendations were merely that—recommendations. [Defendant] was neither bound by these nor was he deliberately indifferent for choosing a different treatment plan than what Plaintiff desires."). Accordingly, De Rosa is entitled to summary judgment.

As for Defendant Esianor, Sims accuses him of unspecified "wrongdoing" and asserts that he did nothing to prevent Sims' pain and suffering. (See Compl. at 15). Contrary to Sims' assertions, however, the record evidence demonstrates that when Sims asked about his one-year follow-up for orthotic shoes, Esianor submitted the consultation request. The following month, when Esianor saw Sims during sick call for his request for refills of Biotene and skin lotion, Esianor provided the Biotene. Sims declined to be seen later that day to discuss with Esianor the results of his recent UMMC endocrinology visit. In light of this evidence, no reasonable fact-finder could conclude that Esianor was deliberately indifferent to Sims' medical needs. Accordingly, Esianor is entitled to summary judgment.

Next, Sims alleges that Defendant Adegorusi did not provide proper medical care and "followed cost-driven motives." (Compl. at 15). This assertion is not supported by the undisputed evidence in the record. In 2019, Adegorusi saw Sims for a complaint that his

---

the filing of Corizon Defendants' dispositive motion. As such, the affidavit need not and did not address De Rosa's prior care of Sims.

left posterior arm was swollen. Sims was assessed as suffering an elbow infection and prescribed antibiotics and analgesic pain medication. Adegorusi saw Sims for a follow-up, noted that the antibiotic had not worked, and then placed a call to Temesgen for a follow-up. Additionally, Adegorusi responded to Sims' complaints of abdominal pain and vomiting by prescribing Zantac, submitting a consultation request for Sims to see a gastroenterologist, and ordering abdominal x-rays. Adegorusi also responded to Sims' hypertension by increasing his Lisinopril prescription and directing that Sims' blood pressure be taken twice a day for one week. The record demonstrates that Adegorusi provided constitutionally adequate responses to each of Sims' complaints, and there is nothing in the medical record suggesting that Adegorusi's treatment of Sims was driven by cost containment motives. As such, Adegorusi is entitled to summary judgment.

Finally, although Sims alleges Dr. Temesgen changed or stopped Sims' medication, there is no indication in Sims' medical record that this occurred. During a June 19, 2019 telemedicine appointment, Temesgen reviewed Sims' chart, discussed the case with Sims' provider, and submitted a request that Sims see a gastroenterologist. Temesgen also noted that Sims' reported abdominal pain and occasionally saw blood in his stool. Temesgen recommended an endoscopy with a gastroenterology evaluation. He also noted that Sims' last colonoscopy in 2015 was normal and a CT scan also conducted in 2015 was unremarkable. At bottom, Sims' disagreement with Temesgen's recommendations following this evaluation are nothing more than a disagreement over the course of treatment, which cannot sustain a claim of deliberate indifference. Accordingly, Temesgen is entitled to summary judgment.

### b.      Supervisory Liability

Liability that is based on the defendant's role as a supervisor or employer of the asserted wrongdoer is known as a <u>respondeat superior</u> theory of liability. It is well established that the doctrine of <u>respondeat superior</u> does not apply in § 1983 claims. <u>See</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 782 (4th Cir. 2004).

In § 1983 claims, liability of supervisory officials "is not based on ordinary principles of <u>respondeat superior</u>, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" <u>Baynard v.</u> <u>Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. <u>See</u> <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Sims alleges that Temesgen, as the Regional Medical Director, had the power to intervene and correct any deficiencies in his medical care. Sims also claims that Hargrave had the power to prevent his pain and suffering. However, there is no evidence in the record that Sims was subjected to unconstitutional conduct by any of the named

Defendants, let alone that Temesgen and Hargrave had knowledge of improper conduct. In other words, because Sims has not suffered a constitutional injury, Temesgen and Hargrave cannot be liable under a theory of supervisory liability. Accordingly, Temesgen and Hargrave are entitled to summary judgment.

### c. Negligence

Finally, Sims asserts that Defendants acted with "negligence"; thus, the Court construes the Complaint asserting a state law claim for negligence or medical malpractice. Such a claim, however, may be asserted only if Sims can demonstrate that he first presented it to the Maryland Health Care Alternative Dispute Resolution Office. See Md. Code Ann., Cts. & Jud. Proc. § 3-2A-10; Wilcox v. Orellano, 115 A.3d 621, 625 (Md. 2015); Rowland v. Patterson, 882 F.2d 97, 99 (4th Cir. 1989) (holding that this requirement applies to medical malpractice claims filed in state or federal court). Here, there is no basis to conclude that Sims satisfied these requirements. Accordingly, Sims' state law negligence and medical malpractice claims must be dismissed.

### D. **Respondeat Superior**

Finally, both Wexford and Corizon argue in their dispositive Motions that Sims' claims against them must be dismissed because they cannot be vicariously liable for the acts of their employees under a theory of respondeat superior. The law in the Fourth Circuit is well established that the doctrine of respondeat superior does not apply in § 1983 claims involving entities such as Wexford and Corizon. See Love-Lane, 355 F.3d at 782 (finding no respondeat superior liability under § 1983). Respondeat superior only applies in circumstances where, for instance, a municipality possesses final authority to establish

policy with respect to the action ordered. See Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Here, Sims has failed to adequately assert constitutional claims against any Wexford or Corizon employee individually, let alone that Wexford or Corizon had a policy or practice that resulted in the denial of Sims' constitutional rights. Accordingly, Sims' Complaint will be dismissed as to Wexford and Corizon.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendant DPSCS's Motion to Dismiss (ECF No. 27); Wexford Defendants' Motion to Dismiss (ECF No. 33); and Corizon Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 37). A separate Order follows.

Entered this 28th day of September, 2020.

_____/s/_____
George L. Russell, III
United States District Judge
